**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| THE CONNECTICUT LIGHT & POWER COMPANY,<br>   Plaintiff,<br>  vs.<br><br>NRG POWER MARKETING INC.,<br>   Defendant. | : No. 01 CV 2373 (AWT)<br>:<br>:<br>:<br>:<br>:<br>:<br>: JULY 30, 2004<br>: |

**DEFENDANT NRG POWER MARKETING INC.'S SUR-REPLY BRIEF IN OPPOSITION TO PLAINTIFF THE CONNECTICUT LIGHT & POWER COMPANY'S MOTION FOR SUMMARY JUDGMENT**

### I. INTRODUCTION

This matter was stayed on May 14, 2003 upon Defendant NRG Power Marketing Inc.'s ("NRG") filing of a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Prior to the stay, Plaintiff Connecticut Light & Power Company ("CL&P") filed a Motion for Summary Judgment on February 28, 2003 and NRG responded on March 19, 2003 with a Memorandum in Opposition to CL&P's Motion for Summary Judgment. NRG emerged from Chapter 11 bankruptcy in December 2003.

CL&P is not entitled to summary judgment for a number of reasons. In its memorandum in opposition to CL&P's motion, NRG argued, <u>inter alia</u>, that the Standard Offer Service Wholesale Sales Agreement ("SOS Contract") does not provide that NRG is responsible for socialized congestion costs; the SOS Contract did not include a provision for calculating, billing or reconciling amounts billed as congestion charges; and the SOS

Contract is ambiguous. CL&P's motion should be denied on additional grounds set forth in this sur-reply brief.

After NRG submitted its memorandum in opposition, it learned that CL&P had entered into certain letter agreements with other standard offer suppliers similarly situated to NRG and made written and oral statements during regulatory proceedings, all of which conflict with CL&P's claims in its motion for summary judgment. CL&P's recently disclosed statements and agreements estop its making various arguments and claims herein, as principles of equity compel CL&P to present consistent factual positions in different judicial forums. Moreover, these recently disclosed statements and agreements further demonstrate the existence of facts, which confirm NRG's claims in this dispute and undermine CL&P's entitlement to summary judgment.

## II.   STATEMENT OF PERTINENT FACTS

**A.   CL&P Acknowledged in Written Agreements That It, Rather Than the Supplier, Is Responsible for the Subject Congestion Charges Under the Terms of the SOS Contract.**

As early as February, 2003, shortly before the implementation by the New England Independent System Operator ("ISONE") and the New England Power Pool ("NEPOOL") of a new transmission congestion management system, referred to as the new Standard Market Design ("SMD"), CL&P entered into certain letter agreements (the "Letter Agreements") with the other two standard offer suppliers who are identically situated to

NRG. Affidavit of David M. Adams Exs. A and B. ("Adams Aff. Ex.___").[1] CL&P unequivocally confirmed in the Letter Agreements its responsibility for congestion charges under the subject SOS Contract. Specifically, the Letter Agreements provided, inter alia, that CL&P would reimburse Duke and Select for SMD related costs, including congestion charges, incurred from the Delivery Point at which Duke and Select (like NRG) delivered the electricity to CL&P under the SOS Contract (defined in the SOS Contract as a point on the NEPOOL PTF), to the ultimate delivery point in CL&P's service area. Paragraph 3 of both Letter Agreements state that:

> CL&P acknowledges responsibility for and agrees to pay Supplier (a) the "LMP Differential Amount".… See Adams Aff. Exs. A and B at 2.

The "LMP Differential" amount is comprised of a number of components, including congestion charges. The "differential" represents the difference between the price at the Delivery Point, where the standard offer suppliers delivered the electricity pursuant to the SOS Contracts, and the point at which CL&P transferred such electricity to its retail customers. Id. at 2.

In other words, two months before CL&P emphatically argued in its Reply Brief in this case that NRG was responsible for all congestion charges under the SOS Contract, it

---

[1] CL&P signed letter agreements with Duke Energy Trading and Marketing Northeast, L.L.C. ("Duke") and with Select Energy, Inc. ("Select"), CL&P's power marketing affiliate. NRG and CL&P did not enter into such an agreement, as CL&P had filed suit against NRG in the Connecticut Superior Court, Judicial District of New Britain, in November 2001. That case was ultimately removed to this Court in 2002.

was acknowledging in the Letter Agreements with the other suppliers under the same contract that it, CL&P, was responsible for moving power, and paying all related costs -- including congestion costs -- from the delivery points, as defined under the SOS Contract, to CL&P's retail customers in Connecticut.

Most significantly, in the last paragraph of each Letter Agreement, CL&P acknowledged and agreed that those Letter Agreements did not modify the terms and conditions of the SOS Contracts, to wit:

> By entering this Letter Agreement, the Parties have not and do not intend to modify the terms of the [SOS Contract], and expressly agree that all terms thereof remain and shall continue in full force and effect. *Id*.

Thus, CL&P has affirmed that it is responsible for congestion charges under the SOS Contract after SMD, and has further affirmed that the Letter Agreements in no way modify the terms of the SOS Contract. *A fortiori*, CL&P is equally responsible for congestion charges prior to SMD.

**B.	During Previous Administrative Proceedings, CL&P Took a Position Inconsistent With Its Present Position and Prevailed in Those Proceedings in Reliance on That Inconsistent Position.**

In April 2003, the same month in which it filed its Reply Brief in this Court, CL&P filed an application with the Connecticut Department of Public Utility Control ("DPUC") seeking the state's authorization to increase CL&P's electricity rates to its retail customers

and access other funds in order to defray its congestion charge expenses under the SOS Contracts.[2]  Adams Aff. Ex. C at 2:

> In this application, CL&P seeks recovery for the LMP differential costs that it will incur over the ten-month period between March 1 and December 31, 2003.
>
>> As described in Mr. Shuckerow's testimony, the LMP includes the price of energy, congestion and PTF losses…. Id. at 2, 5 (emphasis added).

Specifically, CL&P argued to the DPUC that the SOS Contract was clear about CL&P's responsibility for congestion and other charges from March 1, 2003 to December 31, 2003. It stated that the charges were a direct result of CL&P's obligations to provide standard offer service.  Id. at 10.  For the period prior to March 1, 2003, it acknowledged the congestion cost allocation system as one in which congestion costs in New England were socialized and passed on to **all consumers** in New England.  Id. at 4; See also Ex. A at 6 to Adams Aff. Ex. C (Testimony of James Shuckerow).  Such a system is inconsistent with the proposition that the SOS suppliers also are fully responsible for congestion charges. [3] Furthermore, CL&P again acknowledged that market rule changes did not alter the terms

---

[2] On April 22, 2003, CL&P filed the Application of the [CL&P] Concerning Recovery of SMD-Related Costs for March 1, 2003 through December 31, 2003 at the [DPUC], Docket No. 03-04-07 (the "Application").  CL&P stated therein that it needed an electricity price rate increase to cover congestion costs and other expenses because it was responsible for post-SMD congestion charges.

[3] In NRG's memorandum in opposition to CL&P's motion for summary judgment, NRG also cited an example in which CL&P sought rate increases due to various charges, including socialized congestion charges.  Specifically, in April 1999, CL&P petitioned the DPUC for approval of an increased rate to be charged to its SOS Customers.  Def. Mem. in Opp. at 5-6.

and conditions of the SOS Contract, and stated that it had "carefully" reviewed its obligations under the SOS Contract with respect to cost responsibility. Indeed, CL&P attached its counsel's legal analysis to the Application. Adams Aff. Ex. C; See also Adams Aff. Ex. D.

In their legal analysis, CL&P's lawyers concluded that CL&P was responsible for congestion charges under the SOS Contract at least from March 1, 2003 until the end of the term of the contract, or December 30, 2003. CL&P correctly recognized that under the SOS Contract, it took title and liability to the electricity delivered by its suppliers at the Delivery Point, as defined in the SOS Contract. Critically, CL&P also noted that ISONE's and the NEPOOL's implementation of SMD on March 1, 2003 did not change this fact.

> These provisions [with respect to passage of title and liability to CL&P at the supplier's designated delivery points] of the Agreements are clear and the market rule changes resulting from the implementation of the Federal Energy Regulatory Commission ("FERC")-approved SMD do not alter those provisions. Id. at 1. (emphasis added).

*A fortiori*, CL&P was before March 1, 2003 and thereafter is responsible for congestion charges from the Delivery Point to its retail load.

The DPUC granted conditional approval of CL&P's requested rate hike based on the information set forth in CL&P's application. Adams Aff. Ex. E at 3. Specifically, CL&P "requested that the Department conduct an administrative proceeding pursuant to § 16-19b(d) to approve a $.00569/kwh increase in the Energy Adjustment Clause (EAC) to cover SMD-related costs through December 31, 2003." Adams Aff. Ex. E at 2. In

reliance on CL&P's argument, the DPUC granted CL&P's request and CL&P prevailed, securing a rate increase from its retail customers, "[t]herefore, as ordered herein below, the Department will allow recovery of such charges through the EAC..." Id. at 3.

C.  **CL&P Has Formally Asserted That the SOS Contract Is at Least Ambiguous With Respect to Congestion Cost Obligations.**

In proceedings before the FERC, CL&P formally reversed its DPUC position by arguing that congestion costs are the obligation of the generators and by further admitting that the SOS Contract is ambiguous.  Specifically, CL&P affirmed that "legitimate" arguments can be made that the SOS Contract imposes responsibility for congestion charges on CL&P rather than on the suppliers.[4]  Specifically, in its Petition to FERC regarding congestion charges, CL&P made the following admissions:

> The [DPUC] is correct that arguments can be made to support the conclusion that the sellers are responsible for the costs of congestion and losses under SMD, and CL&P intends to present those arguments herein.  Having initially construed the SOS Agreements otherwise, however, **CL&P is in no position to claim that legitimate contrary arguments do not also exist.**"  (emphasis added).  Declaratory Order, EL03-129-000 Adams Aff. Ex. F at 4

---

[4]  In May 2003, CL&P filed its Petition for a Declaratory Order at the FERC, in which it requested that the FERC issue an order finding that suppliers Select and Duke were responsible for congestion charges under the SOS Contracts during the post-SMD period, beginning March 1, 2003. (FERC Docket No. EL03-129-000).  CL&P did not include NRG as a party, as its dispute with NRG over their SOS Contract was already the subject of a different FERC proceeding. (FERC Docket No. EL03-123-000).

In the same Petition to the FERC, CL&P again acknowledged that the terms of the SOS Contract, especially those concerning the responsibility for congestion charges, were in no way changed by ISONE's imposition of SMD.

> Although the methodology for allocating congestion costs to CL&P in NEPOOL has changed under SMD, *the responsibility for congestion charges has not*. (emphasis added). The congestion costs that are being incurred under SMD are the same category of costs as before SMD--those additional costs of energy resulting from the need to re-dispatch generation to resolve transmission limitations. Id. at 18.

Finally, James R. Shuckerow, Jr., who at the time in 2003 was the Director of Wholesale Power Contracts for Northeast Utilities Service Company ("NU"), CL&P's parent company, and is thoroughly familiar with the SOS Contract, admitted that the SOS Contract is ambiguous.

> Q.  Now I believe you [Mr. Shuckerow] testified earlier in response to one of Mr. Johnson's questions that it is NU's management position that ratepayers in Connecticut are responsible for the entire [LMP] differential that's computed in paragraph three of the letters [Letter Agreements]with Select and Duke? Is that right? [5]
>
> A.  That was the position in the January-February time period that led to the letter agreements.
>
> Q.  And do you know if that is still NU management's position?
>
> A.  I think as a result of all the discussions we've had with regards to Congestion, we believe the contract is ambiguous.

---

[5] See the Letter Agreements, Adams Aff. Exs. A and B. Paragraph 3 of the Letter Agreements set forth a calculation that determines CL&P's LMP costs, which includes congestion charges. Id.

<u>Adams Aff. Ex. G.</u> (FERC Hearing concerning post-SMD costs, FERC Docket No. EL03-135-000 and 001).

### III.     ARGUMENT

**A.     <u>Standard for Applying Judicial Estoppel</u>**

Courts have applied the principle of judicial estoppel in order to bar a party from asserting inconsistent arguments in different forums in an effort to support shifting strategies.  Courts are incredulous of parties who present inconsistent arguments in different forums to fulfill disingenuous ends, and have estopped parties from doing so. <u>New Hampshire v. Maine</u>, 532 U.S. 742 (2001).

The court in <u>New Hampshire</u>, which estopped the State of New Hampshire from changing its position with respect to its boundary with Maine, set forth the test for establishing whether judicial estoppel should be applied.

> Under the judicial estoppel doctrine, where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position.…  The purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to exigencies of the moment.  <u>Id</u>. at 742-743, 1810.

The Fourth Circuit has said that the principle of judicial estoppel should be invoked to "prevent the use of 'intentional self-contradiction…as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'" <u>Allen v. Zurich Ins. Co.</u>, 667

F.2d 1162, 1167 (4th Cir. 1982), (quoting, Scarano v. Central R. Co., 203 F.2d 510, 513 (3d Cir. 1953)).

The New Hampshire court also noted that a court should consider several factors in deciding whether to apply judicial estoppel to a particular case.  First, a party's position must be inconsistent from one period to the next.  Second, the court should ascertain whether the party succeeded with its earlier argument in the applicable forum and whether acceptance of an inconsistent position in the later proceeding would evince the contention that either the first or the second tribunal was misled.  Third, the court should determine whether the party attempting to offer the inconsistent position would gain an unfair advantage or impose an unfair burden on the other party if not estopped.  New Hampshire v. Maine, 532 U.S. at 743.

Courts have also applied this doctrine when a party sought to assert one position in an administrative forum, as did CL&P at the DPUC, and a conflicting position in a court proceeding.  Smith v. Montgomery Ward & Co., 388 F. 2d 291 (6th Cir. 1968).  In the Smith case, the plaintiff had stated, in a supplemental worker's compensation proceeding, that his injuries were caused by an industrial accident.  The court estopped him from asserting in the later court proceeding that his condition arose out of an altercation he had with his employer's detectives, who were hired to investigate his worker's compensation claim.  Id. at 291.

B.  **CL&P Should Be Estopped From Asserting Positions in This Proceeding That Are Inconsistent With the Positions It Asserted in Proceedings Before the DPUC**

CL&P made statements to the DPUC for the purpose of gaining advantage before that forum which were contrary and inconsistent with statements it has made to this Court. Specifically, CL&P admitted that the implementation of SMD did not change the meaning of the terms in the SOS Contract and that those terms impose responsibility on it for congestion charges from the Delivery Point to its retail customers.  Adams Aff. Ex. D at 1, 3.  CL&P should be estopped in this proceeding from denying that the SOS Contract imposes congestion charges on it from the Delivery Point to its retail customers.  It may not and should not have its cake and eat it to by arguing one position before the DPUC and another before this Court particularly where the arguments that were made to the DPUC were acted upon favorably for CL&P.

C.  **CL&P Should Be Estopped From Denying That the SOS Contract Is Ambiguous**

CL&P should be estopped from arguing that the SOS Contract is not capable of two different interpretations and clearly places responsibility for congestion charges on NRG, as it argued in its Reply Brief.  Reply Brief at 1 (Apr. 3, 2003).  CL&P also should be estopped from arguing that the SOS Contract is clear and unambiguous with respect to NRG's responsibility for congestion charges.  Reply Brief at 2, 8, and 10.  Before the FERC, CL&P unequivocally admitted that the language of the SOS Contract creates "legitimate contrary arguments" to its position in this case that congestion costs are

imposed upon the suppliers.  <u>Adams Aff. Ex. F at 4</u>.  Certainly, a hallmark of ambiguity is whether the same language is capable of different "legitimate" interpretations.  How can language be clear but still capable of different and conflicting interpretations?  Moreover, James Shuckerow, on behalf of CL&P, testified before FERC that CL&P "believe[s] the [SOS] contract is ambiguous."  <u>See</u> <u>Adams Aff. Ex. G</u>.  Nothing can be more clear than a candid admission by a CL&P representative that the SOS Contract is ambiguous.  CL&P should be estopped in this proceeding from denying that ambiguity.

## CONCLUSION

CL&P's Letter Agreements in February 2003 with two of its standard offer suppliers, its admissions and statements before the DPUC and the FERC beginning in April 2003 and continuing into October 2003 are in contradiction with the arguments that CL&P has made before this court in support of its motion for summary judgment.  After prevailing, in large measure, before the DPUC, it reversed itself to suit its purposes at the FERC and in this court.

All this stands as an admission that the SOS Contract language imposes responsibility on CL&P for congestion charges both before and after the implementation of SMD.  At a bare minimum, they acknowledge ambiguity in the contract language about which CL&P now seeks summary judgment.

CL&P should be estopped from making arguments in this court that are in sharp contrast to its proffered arguments before the DPUC, and summary judgment should be denied.

DEFENDANT - NRG POWER MARKETING INC.

By _____
　　Elizabeth Stewart (ct01316)
　　Matthew J. Budzik (ct19706)
　　Murtha Cullina LLP
　　CityPlace I
　　Hartford, CT  06103-3499
　　Telephone No. (860) 240-6000
　　Fax No. (860) 240-6150
　　estewart@murthalaw.com
　　mbudzik@murthalaw.com

　　Frederick W. Morris (ct23373)
　　Leonard, Street and Deinard
　　 Suite 2300, 150 South Fifth Street
　　Minneapolis, MN  55402
　　Telephone No. (612) 335-1500
　　Fax No. (612) 335-1657
　　Frederick.morris@leonard.com

CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing DEFENDANT NRG POWER MARKETING INC.'S SUR-REPLY BRIEF IN OPPOSITION TO PLAINTIFF THE CONNECTICUT LIGHT & POWER COMPANY'S MOTION FOR SUMMARY JUDGMENT was mailed first-class, postage prepaid, on this 30th day of July, 2004 to:

William Shields, Esq.
Jonathan I. Handler, Esq.
Day, Berry & Howard LLP
260 Franklin Street
Boston, MA  02110

John Nolan, Esq.
Day Berry & Howard, LLP
CityPlace I
Hartford, CT  06103-3499

_____
Matthew J. Budzik