UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2005 FEB 17 P 1: 35

| | |
|---|---|
| CONNECTICUT LIGHT & POWER COMPANY,<br><br>　　Plaintiff,<br><br>VS.<br><br>NRG POWER MARKETING INC.,<br><br>　　Defendant. | CIVIL ACTION NO.<br><br>3:01CV02373 (AWT)<br><br><br><br><br><br>August 24, 2004 |

**PLAINTIFF'S REBUTTAL MEMORANDUM TO SUR-REPLY MEMORANDUM**

**I. INTRODUCTION**

Fourteen months after the Summary Judgment record was complete and six months after it emerged from bankruptcy, Defendant NRG has filed a sur-reply memorandum citing "new evidence." Connecticut Light & Power Company ("CL&P") responds herewith.

NRG's "new evidence" is not new, and the factual record it has presented is incomplete, misquoted, and totally misconstrued. Far from supporting NRG's desired conclusion, the materials presented underscore and affirm CL&P's claims in this case and demonstrate that the other suppliers, Duke and Select, read the Agreement consistently with CL&P.

**II. NRG'S THREE ARGUMENTS**

NRG makes three arguments:

　　A.　that CL&P acknowledged in written agreements that it, rather than suppliers like NRG, is responsible for congestion charges [Argument A, Sur-Reply at 2-4]. It did not.

　　B.　that CL&P took regulatory positions inconsistent with that presented in its Motion for Summary Judgment [Argument B, Sur-Reply at 4-7]. It did not.

    C.   that CL&P has admitted the Agreement is ambiguous on the material issue in this case [Argument C, at 7-9]. It has not.

On the basis of this trio of arguments, NRG suggests that CL&P is estopped from asserting "inconsistent" positions. Because CL&P does not, and never has asserted inconsistent positions, NRG's estoppel theory fails.

### III. CL&P's RESPONSE TO THE THREE ARGUMENTS

Each of the three arguments is addressed below.

**A.   CL&P did not acknowledge in letter agreements with Duke and Select that it was responsible for congestion charges.**

It will be remembered that the Agreement at issue in this case was for a three year term from January 1, 2000 to December 31, 2003. Suppliers like NRG have always been responsible and remain responsible for congestion charges for the entire term.

Two years and three months into the term, New England's re-designed wholesale power market opened for business on March 1, 2003. The market was called Standard Market Design ("SMD") and included a new methodology for measuring the price of energy, losses, and congestion.[1] Supplemental Affidavit of Robert A. Baumann.

Prior to SMD, congestion charges were allocated or "socialized" by a formula tied to the assignment of Regional Network Service. After SMD, congestion charges were no longer socialized, but were quantified at various pricing nodes, i.e., measurement points, on New England's Pool Transmission Facilities, or PTF. The question then came how, beginning on March 1, 2003, the suppliers, Duke, Select, and NRG, should be allocated their appropriate share of congestion costs under SMD. Id.

---

[1] NRG has no doubt forgotten that its very own Affidavit of Michael Pavo, filed with its Opposition to CL&P's Motion for Summary Judgment in March, 2003, addressed SMD and its consequences. Pavo Affidavit, ¶ 6.

2

The subject matter of the Letter Agreements with suppliers Select and Duke was not whether they were responsible for congestion charges, but rather, after March 1, 2003 at what node or measuring point on the PTF (delivery point) the suppliers would henceforward be obligated to pay for congestion, energy, and losses. CL&P and the suppliers argued for different nodes, and the issue was ultimately resolved in a settlement, which was approved by the Federal Energy Regulatory Commission. Id.

In short, the Letter Agreements take as their premise the fact that Duke and Select are responsible for congestion and then agree prospectively for purposes of SMD the location at which their responsibility is measured. To suggest, as does NRG, that the agreements somehow shift responsibility for congestion charges *ab initio* is pure fantasy.

### B. CL&P did not take inconsistent regulatory positions at the Connecticut DPUC.

NRG argues that in rate proceedings, CL&P took inconsistent positions from those advanced in this case regarding responsibility for congestion charges. NRG is simply wrong.

In April, 2003 CL&P filed for recovery of new post-SMD costs, i.e., costs that it would incur after March 1, 2003 as a result of SMD. The caption of the proceedings says as much, i.e., "Application ... Concerning Recovery of SMD-Related Costs for March 1, 2003 through December 31, 2003." Supplemental Affidavit of Robert A. Baumann. The issue was simply how CL&P would recover incremental costs it would incur as a result of SMD. Those additional costs resulted from the locational marginal pricing differential between competing delivery (measurement) points on the New England PTF. See discussion in A, above.

There is nothing in the Connecticut DPUC proceeding nor any evidence cited by NRG that argues that SMD in any way changed the suppliers' obligation to pay for congestion. Id. The Connecticut DPUC proceeding dealt with the point at which the supplier's congestion

3

obligations would be measured, not with the question of congestion responsibility. That responsibility had always been, and continued to be, the supplier's responsibility.

### C. CL&P has never asserted that the Agreement was ambiguous in the way NRG suggests.

The Agreement between NRG and CL&P, which was negotiated and signed in 1999, unambiguously places the obligation to pay for congestion charges on NRG. In 1999 the advent of SMD was unknown and unknowable. With the changes associated with the arrival of SMD, CL&P and its suppliers had legitimate arguments as to the proper delivery point in the Agreements, not arguments as to who would be responsible for congestion charges. The only question was what delivery point(s) would be utilized for measuring those suppliers' obligations to pay for congestion.[2] It is absurd to suggest, as does NRG, that ambiguity as to the appropriate delivery point(s) in any way affected the overall responsibility for congestion charges. That responsibility remained, both pre-SMD and post-SMD, the obligation of the suppliers.

### IV. CONCLUSION

For the foregoing reasons NRG's assertion that CL&P took inconsistent and conflicting positions is fabrication. Accordingly, NRG's sur-reply should be ignored as irrelevant to these summary judgment proceedings.

---

[2] The FERC materials cited by NRG by their own terms deal with one "ambiguity" alone, i.e., the ambiguity created by SMD as it related to the delivery point(s) at which post-SMD charges would be quantified

4

|  |  |
|---|---|
| Dated: August 24, 2004 | CONNECTICUT LIGHT & POWER COMPANY<br>By its attorneys,<br><br>*/s/ William Shields*<br>William Shields (ct23371)<br>Jonathan I. Handler (ct23372)<br>Day, Berry & Howard LLP<br>260 Franklin Street<br>Boston, MA 02110<br>Telephone No. (617) 345-4600<br>Fax. No. (617) 345-4745<br>wshields@dbh.com<br>jihandler@dbh.com |

## CERTIFICATE OF SERVICE

    I, William Shields, hereby certify that on this 24th day of August, 2004, I served by first class mail the foregoing document upon Elizabeth J. Stewart, Murtha Cullina, LLP, Whitney Grove Square, 4th Floor, Two Whitney Grove Avenue, New Haven, CT 06503 and upon David M. Adams and Frederick W. Morris, Leonard, Street and Deinard, 150 South Fifth Street, Suite 2300, Minneapolis, MN 55402.

                                                                               _____
                                                                               William Shields