UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-------------------------------x
CONNECTICUT LIGHT & POWER        :
COMPANY,                         :
                                 :
     Plaintiff,                  :
                                 :
V.                               :   CASE NO. 3:01CV02373(AWT)
                                 :
NRG POWER MARKETING INC.,        :
                                 :
     Defendant.                  :
-------------------------------x
```

<u>RULING ON MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Connecticut Light & Power Company ("CL&P") brings this action in a two-count complaint against NRG Power Marketing Inc. ("NRG") asserting a claim for breach of contract and a claim for a declaratory judgment. NRG asserts four counterclaims: Count I, breach of contract for failure by CL&P to refund amounts paid by NRG for congestion charges; Count II, breach of contract for CL&P's failure to pay amounts due and unilaterally deducting those amounts from the amounts due under monthly invoices; Count III, breach of the implied covenant of good faith and fair dealing; and Count IV, unjust enrichment. The plaintiff has moved for summary judgment on all counts of the complaint and NRG's counterclaims, and its motion is being granted.

I.    **Factual Background**

The New England Power Pool ("NEPOOL") "was created as a voluntary association of electric utilities in New England which established a single regional network to direct the operations of

the major generating and transmission facilities in the region."
(Frederick W. Morris Aff. (Doc. No. 39), at Ex. A).  The
Independent System Operator for New England ("ISONE") "was
created to ensure competition in the generation and sale of
electricity within NEPOOL."  Id.  ISONE administers the NEPOOL
Open Access Transmission Tariff ("NEPOOL OATT"), which contains
regulations and rates, including a provision for congestion
charges, and is approved by the Federal Energy Regulatory
Commission ("FERC").  At all times pertinent to the complaint,
congestion charges were socialized under the NEPOOL OATT, meaning
that "[r]egardless of where the transmission congestion was
occurring, those costs were assigned to transmission providers
and customers on a pro rata basis depending on their share of
total network load."  (Michael Pavo Aff. (Doc. No. 38), at ¶ 6).
Section 24 of the NEPOOL OATT provides:

> If limitations in available transmission capacity over
> any interface within the NEPOOL Control Area in any hour
> require that the System Operator dispatch resources out-
> of-merit, the System Operator shall determine for the
> affected area or areas the aggregate of the Congestion
> Costs for all such out-of-merit resources for the hour.
> The Congestion Costs for each hour in any month shall be
> paid as a transmission charge . . . .
>
> ***
>
> [T]he "Congestion Cost" of an out-of-merit resource for
> an hour means the product of (i) the difference between
> its Dispatch Price and the Energy Clearing Price for the
> hour, times (ii) the number of megawatt hours of out-of-
> merit generation produced by the resource for the hour.

(Robert A. Baumann Aff. (Doc. No. 40), at Ex. 1).

CL&P sought to enter into supply contracts to enable it to meet 50% of the total Standard Offer Service ("SOS") Requirements of CL&P's customers during the period from January 1, 2000 to December 31, 2003.[1]  The Department of Public Utility Control ("DPUC"), in a decision dated July 9, 1999, approved CL&P's "proposal to conduct a competitive solicitation process to procure 50% of the electricity supply required to serve the standard offer."  (Shields Aff., at Ex. 4).

J.P. Morgan & Co. ("J.P. Morgan") conducted the bidding process as DPUC's exclusive agent on behalf of CL&P.  J.P. Morgan issued a Descriptive Memorandum and Request for Proposals which provided:

> Winner(s) will be responsible for all requirements and costs associated with meeting the contracted-for portion of CL&P's Standard Offer Service Requirements and Back-Up Services, including energy, Installed Capability, Operable Capability, Operating Reserves, Automatic Generation Control, VAR support, tie benefit payments, losses, any congestion charges, any other future requirements of NEPOOL and the Independent System Operator ("ISO") and any other future or current ISO administration charges as may apply to a load servicing entity[.]

(Shields Aff., at Ex. 5, Section IV.1).  J.P. Morgan also held a

---

[1] Section 20 of Public Act 98-28, "'An Act Concerning Electric Restructuring' describes Standard Offer service as the electric generation services provided by an electric distribution company to any customer who (a) affirmatively chooses to receive electric generation services from such electric distribution company or (b) does not or is not able to arrange for or maintain electric generation services with an electric supplier." (Shields Aff., at Ex. 5).

conference with potential bidders on August 12, 1999.  A request
for proposals dated July 16, 1999 stated:

> The selected Standard Offer Service Requirements
> contractor(s), will be responsible for all requirements
> and costs associated with meeting the contracted-for
> portion of CL&P's Standard Offer Service Requirements and
> Back-up Services, including energy, Installed Capability,
> Operable Capability, Operating Reserves, Automatic
> Generation Control, VAR support, tie benefit payments,
> losses, any congestion charges and any other future
> requirements of NEPOOL and the Independent System
> Operator ("ISO").

(Morris Aff., at Ex. G).  Craig Ganter, NRG's Rule 30(b)(6)

witness, testified that, after the presentation, J.P. Morgan

provided additional information concerning the congestion

charges.  "The clarification came from J.P. Morgan and in some

subsequent e-mails or faxes or however they transmitted the

answers to the questions that were raised at this technical

conference, or they could have been raised subsequent to it

because I believe they gave you an opportunity to ask them

questions."  (Ganter Dep. (Morris Aff., at Ex. L), at 34).  When

asked, "[a]nd by 'clarification' you mean that NRG would not be

responsible for congestion charges?", Ganter responded,

"[r]ight."  Id. at 33-34.  The clarification Ganter was referring

to is a communication from J.P. Morgan dated August 25, 1999,

where the following question and answer appeared:

> **Question:**
> Section IV of the RFP transmission is addressed, what
> does it mean in the Descriptive Memorandum that CL&P will
> assist the bidders?  What will CL&P actually do and be
> responsible for in making transmission arrangements?

What charges will CL&P as a transmission provider actually be responsible for and what charges will the winning bidder be responsible for? Connecticut requires as part of the electric industry restructuring that a customer receives a bill that clearly identifies costs associated with Transmission and Distribution charges and charges that are associated with the price of energy at the meter[,] it is unclear from the RFP which entity will be responsible with the various charges associated Transmission, Distribution, etc. Please provide a complete list of all transmission components that CL&P will be responsible to pay and those that a bidder will have responsibility for.

**Response:**
The bidder is not responsible for obtaining transmission service over the CL&P transmission system. CL&P will be responsible for Regional Network Service (RNS) and associated Schedule 1 and 2 charges through the NEPOOL Tariff and Local Network Service (LNS) and associated Schedule 1 charges through the NU System Companies' Open Access Transmission Service Tariff No. 9. In addition CL&P will be responsible for all ISO related charges assigned to transmission providers only. The bidder will be responsible for transmission charges to get power to the PTF outside of the NU PTF and those charges appropriately assigned to it by NEPOOL and/or the ISO.

(Morris Aff., at Ex. M). Part 1 of Section IV of the Descriptive Memorandum is quoted above. Part 2 of that section states:

CL&P will assist Winner(s) to make arrangements for Regional Network Service Under NEPOOL's open access tariff, Local Network Service under CL&P's open access tariff, and Distribution Service under the jurisdictional retail delivery tariff of the DPUC. The supplier will be responsible for losses to the customers' meters[.]

(Shields Aff., at Ex. 5, Section IV.2).

NRG was a successful bidder, and CL&P and NRG entered into a Standard Offer Service Wholesale Sales Agreement (the "Agreement") dated as of October 29, 1999, pursuant to which NRG, as the "Seller," was obligated to supply a portion of the

wholesale power needs of CL&P, as the "Buyer."

Section 1.10 of the Agreement provides that:

**"SOS Requirements Power"** means the firm wholesale power that Seller is obligated to deliver as defined in Section 3.1.

(Shields Aff., at Ex. 3).  Section 3.1 of the Agreement defines

SOS Requirements Power as follows:

SOS Requirements Power is the wholesale power delivered at the Delivery Points(s) that is supplied at all times and in quantities reflecting the full requirements for power of Retail Customers purchasing Standard Offer Service from CL&P.  SOS Requirements Power shall be firm and shall vary in quantity from minute to minute, hour to hour, day to day and month to month based on the consumption patterns of Retail Customers.  SOS Requirements Power includes power supply and ancillary services, in such amounts as are required for the Buyer to serve the Contract Load Quantity plus losses at all times throughout the Term.  SOS Requirements Power includes all of the power supply and ancillary services that are or may be necessary to serve electrical load under the Restated NEPOOL Agreement during the Term, including Energy, Installed Capability, Operable Capability, Operating Reserves, Automatic Generation Control, electrical losses, <u>congestion charges imposed under the NEPOOL Transmission Tariff</u>, charges of the ISO associated with NEPOOL membership and with serving the Contract Load Quantity, and any future additions, deletions or changes to the seven NEPOOL products (Energy, Installed Capability, Operable Capability, 30-minute Non-Spinning Operating Reserves, and Automatic Generation Control) that are required for entities serving electrical load in NEPOOL.  SOS Requirements Power shall also include such transmission and distribution delivery services as may be required for the Seller to deliver SOS Requirements Power to the Delivery Point(s).  SOS Requirements Power shall not include any current or future requirement to meet a renewable energy portfolio standard in the State of Connecticut.

(Shields Aff., at Ex. 3) (emphasis added).

Also, the Agreement provides, at Section 3.10, that:

6

> The Seller shall be responsible for and shall pay all ISO
> and NEPOOL charges and expenses associated with the
> provision of SOS Requirements Power, except for any such
> ISO or NEPOOL charges that are imposed directly on the
> Buyer in connection with the provision of Delivery
> Services by the Buyer.

(Shields Aff., at Ex. 3). However, "Delivery Services" is

defined in Section 1.4 of the Agreement as not including

congestion charges:

> **"Delivery Services"** means the combination of Regional
> Network Service ("RNS") over NEPOOL PTF acquired pursuant
> to the NEPOOL Transmission Tariff, Local Network Service
> ("LNS") over the Buyer's Non-Pool Transmission Facilities
> pursuant to the NU Operating Companies open access
> transmission tariff, and firm distribution services under
> the Buyer's distribution service tariff that are provided
> by the Buyer for the delivery of SOS Requirements Power
> for the Contract Load Quantity. <u>Delivery Services shall
> not include losses, congestion charges, ancillary
> services or any ISO charges associated with SOS
> Requirements Power, all of which shall be the
> responsibility of the Seller.</u>

(Shields Aff., at Ex. 3) (emphasis added).

The Agreement also contains a provision, in Section 3.12,

which addresses how the parties will handle any rebates of

congestion charges:

> If and to the extent that, at any time during the Term,
> the congestion management scheme in effect under the
> NEPOOL Transmission Tariff provides for the automatic
> assignment of rights to rebates of transmission
> congestion charges to retail loads of the Buyer, the
> Seller shall be entitled to a portion of such congestion
> rebate rights based on the ratio between the Contract
> Load Quantity and the Buyer's retail load that is subject
> to the automatic assignment of such rights.

(Shields Aff., at Ex. 3).

Finally, the Agreement contains a merger clause in Section

19.1, which states that "[t]his Agreement constitutes the entire
agreement between the Parties and supersedes all previous offers,
negotiations, discussions, communications and correspondence."
Id.

In correspondence dated April 20, 2000, CL&P informed NRG
that NRG was responsible, pursuant to the Agreement, for
congestion charges and CL&P had determined NRG's share of the
charges for January and February 2000.  These charges amounted to
$6,416,433 for January and $5,905,667 for February.  NRG made a
payment of $1,181,774.28.[2]  By letter dated July 18, 2000, NRG's
attorney contacted CL&P regarding the congestion charges.  The
letter stated:  "Unfortunately, NRG has already paid at least
$1,181,724.28 of these charges without an understanding of
whether the amounts were appropriately due under the Standard
Offer Contract."  (Shields Aff., at Ex. 10).  The letter stated
that NRG would not pay make any further payments and that,
pursuant to the terms of the Agreement, "NRG is only responsible
for, at most, a portion of the congestion charges."  Id.
Northeast Utilities ("NU") responded, on behalf of CL&P, with a
letter dated August 17, 2000.

CL&P then withheld payments based on SOS related congestion

---

[2] A letter from NRG's attorney stated that at least
$1,181,724.28 was paid (see Shields Aff., at Ex. 10), but the
Electronic Funds Transfer dated 6/20/2000 indicates that NRG made
a transfer to CL&P of $1,181,774.28.  Id. at Ex. 8.

charges and interest for periods from March 2002 through December 2002, pursuant to Section 5.4 of the Agreement.  Section 5.4 provides that "[t]he disputed amount [of a bill] may, at the discretion of the Buyer, be held by the Buyer until the dispute has been resolved; provided that the Buyer shall be responsible to pay interest on any withheld amounts that are determined to have been properly billed . . . ."  (Shields Aff., at Ex. 3).

Northeast Utilities Service Company ("NUSCO") moved to intervene in Docket No. ER00-1659-000 before the Federal Energy Regulatory Commission on behalf of NU Operating Companies, which included CL&P.  In a motion to intervene and protest dated March 14, 2000, NUSCO and others argued:

> The current method of allocating congestion costs within NEPOOL spreads the costs to each transmission customer on a pro rata basis.  The costs are distributed over the entire NEPOOL load, thereby socializing the costs and masking the responsibility for them.  This method distorts the competitive market pricing signals for electricity that the States served by Central Maine, UI, and the NU Operating Companies are trying to promote through restructuring initiatives which give retail customers a choice of suppliers.

(Morris Aff., at Ex. F).  "These congestion costs should be borne by those who cause them.  Instead, some participants receive an undeserved windfall, while blameless others pay a subsidy."  Id.

Effective March 1, 2003, the Standard Market Design (SMD) replaced the system for socialized congestion charges and "each distinct location (node) has a calculated price for energy, losses and congestion."  (Pavo Aff., at ¶ 6).  Under the SMD,

congestion charges "were quantified at various pricing nodes, *i.e.,* measurement points, on New England's Pool Transmission Facilities (PFT)."  (Baumann Supp. Aff. (Doc. No. 64), at ¶ 6).

## II.  Legal Standard

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  See Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury.  The court, therefore, may not try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Board of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from

the facts are jury functions, not those of the judge." <u>Anderson</u>,
477 U.S. at 255.  Thus, the trial court's task is "carefully
limited to discerning whether there are any genuine issues of
material fact to be tried, not to deciding them.  Its duty, in
short, is confined . . . to issue-finding; it does not extend to
issue-resolution." <u>Gallo</u>, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be
resolved is <u>both</u> genuine <u>and</u> related to a material fact.
Therefore, the mere existence of <u>some</u> alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment.  An issue is "genuine
. . . if the evidence is such that a reasonable jury could return
a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248
(internal quotation marks omitted).  A material fact is one that
would "affect the outcome of the suit under the governing law."
<u>Anderson</u>, 477 U.S. at 248.  As the Court observed in <u>Anderson</u>:
"[T]he materiality determination rests on the substantive law,
[and] it is the substantive law's identification of which facts
are critical and which facts are irrelevant that governs." <u>Id</u>.
at 248.  Thus, only those facts that <u>must</u> be decided in order to
resolve a claim or defense will prevent summary judgment from
being granted.  When confronted with an asserted factual dispute,
the court must examine the elements of the claims and defenses at
issue on the motion to determine whether a resolution of that

11

dispute could affect the disposition of any of those claims or defenses.  Immaterial or minor facts will not prevent summary judgment.  <u>See</u> <u>Howard v. Gleason Corp.</u>, 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor."  <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000)(quoting <u>Del. & Hudson Ry. Co. v. Consol. Rail Corp.</u>, 902 F.2d 174, 177 (2d Cir. 1990)).  Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence.  "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment.  <u>Stern v. Trs. of Columbia Univ.</u>, 131 F.3d 305, 315 (2d Cir. 1997) (quoting <u>W. World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d. Cir. 1990)).  Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant.  <u>Anderson</u>, 477 U.S. at 252.

**III. Discussion**

"If the language of the contract is susceptible to more than

12

one reasonable interpretation, the contract is ambiguous . . . . By contrast, language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion.'" <u>Goldberg v. Hartford Fire Ins. Co.</u>, 269 Conn. 550, 559 (2004). Furthermore, "'any ambiguity . . . must emanate from the language used in the contract rather than from one party's subjective perception of the terms.'" <u>Id.</u> at 559 (citation omitted); <u>Schultz v. Hartford Fire Ins. Co.</u>, 213 Conn. 696, 702-03 (1990) ("If . . . the words in the policy 'are plain and unambiguous, the established rules for the construction of contracts apply, the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties.'").

"'Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law . . . .'" <u>Tallmadge Bros., Inc. v. Iroquois Gas Transmission System, L.P.</u>, 252 Conn. 479, 495 (2000). "Where . . . the parties to the contract are sophisticated business entities, the Supreme Court

13

has recognized a presumption of definiteness in the words of the contract and has concluded that 'the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract.'" <u>SCP Corp. v. BankBoston</u>, No. X01CV980150598, 2001 WL 51655, at *2 (Conn. Super. Ct. Jan. 3, 2001) (quoting <u>Tallmadge Bros.,</u> 252 Conn. at 498)).

Furthermore, "'courts have been increasingly willing to flesh out the intended meaning of indefinite contract language by recourse to trade, custom, standard usage and past dealings . . . .'" <u>Artman v. Output Technologies Solutions Eastern Region, Inc.,</u> No. CV 000595362S, 2000 WL 992166, at *2 (Ct. Super. Ct. June 30, 2000) (citation omitted). "Evidence of trade usage may be material to the parties' intention concerning the meaning of a term if 'the parties knew or ought to have known of a business usage corresponding to a particular provision inserted in their contract.'" <u>James A. Manafort, JR., PPA et al. v. Essex Insurance Company</u>, No. CV000504675S, at *5 (Ct. Super. Ct. July 20, 2001) (citation omitted).

Here, Sections 1.10 and 3.1 of the Agreement, read together, provide in clear and unambiguous language that NRG is responsible for payment of congestion charges. Section 1.10 states in clear

14

and unambiguous terms that NRG is obligated to deliver SOS
Requirements Power, as that term is defined in Section 3.1.  In
turn, Section 3.1 states in clear and unambiguous terms that SOS
Requirements Power includes "congestion charges imposed under the
NEPOOL Transmission Tariff."  NRG's obligation to pay congestion
charges is then repeated in Section 3.10 of the Agreement, which
states that NRG shall pay all NEPOOL charges associated with the
provision of SOS Requirements Power; the definition of Delivery
Services in Section 1.4 makes it clear that the exception in
Section 3.10 does not relieve NRG of the obligation to pay
congestion charges.

        This clear and unambiguous language providing that NRG is
responsible for payment of congestion charges is consistent with
Section 3.12 of the Agreement, which covers how NRG's portion of
any rebates of congestion charges will be determined.  Inclusion
in the Agreement of a provision for payment of any rebates of
congestion charges to NRG and not CL&P makes sense only if NRG,
and not CL&P, is the party paying the congestion charges.

        NRG advances numerous arguments in an effort to import
ambiguity into the Agreement.  However, NRG never suggests a
reasonable alternative interpretation of the above-referenced
language in Sections 1.10 and 3.1 and 3.10 of the Agreement.  It
simply ignores that language.

        Among NRG's arguments is one that allocation to NRG of the

15

responsibility for paying congestion charges is inconsistent with
the general purpose of the Agreement, which is to set forth NRG's
responsibility to deliver power to defined Delivery Point(s), and
congestion charges is more associated with transmission than with
generation of power.  NRG points to particular provisions of the
Agreement that are consistent with its point that congestion
charges is more associated with transmission than with generation
of power and argues that interpreting the Agreement to make NRG
responsible for paying congestion charges is inconsistent with
those provisions.  That is not the case.  The fact that certain
provisions of the Agreement reflect that congestion charges is
more associated with transmission than with generation of power
does not preclude the parties from agreeing that, notwithstanding
that fact, NRG will be responsible for payment of congestion
charges.  That is what CL&P and NRG did here, and unlike the
interpretation urged by NRG, such an interpretation of the
Agreement does not ignore or distort any of its provisions.

NRG argues that the Agreement is ambiguous because the term
"congestion charges" is not defined in the Agreement, and also
that the Agreement cannot contemplate payment by NRG of
congestion charges because it contains no mechanism for billing
and collection of congestion charges.  NRG argues that the
Agreement is ambiguous about whether the phrase "congestion
charges" was intended by the parties to mean the socialized

16

transmission congestion charges imposed on CL&P under the NEPOOL
OATT.  However, Section 3.1 of the Agreement explicitly includes
as part of SOS Requirements Power "congestion charges imposed
under the NEPOOL Transmission Tariff," and there is no genuine
issue as to the fact that, at all times pertinent to the
complaint, congestion charges were socialized under the NEPOOL
OATT.  As to NRG's argument that the Agreement contains no
mechanism for billing and collection of congestion charges, the
court notes first, that there is no question as to how congestion
charges will be determined, i.e. they will be the charges imposed
under the NEPOOL Transmission Tariff administered by ISONE, and
second, that there are other charges or expenses included in the
definition of SOS Requirements Power and there is no mechanism
explicitly set forth in the Agreement for billing and collection
of those charges or expenses either.  While NRG might be able to
create a genuine issue as to the mechanism for billing and
collection of congestion charges, that is quite different from an
ambiguity in the Agreement as to which party is responsible for
payment of congestion charges.

NRG also points to the August 25, 1999 communication from
J.P. Morgan in support of its argument that there is a genuine
issue as to whether the Agreement is ambiguous.  The Connecticut
Supreme Court has stated, "[g]enerally . . . 'we continue to
adhere to the general principle that the unambiguous terms of a

17

written contract containing a merger clause may not be varied or contradicted by extrinsic evidence.'" Alstom Power, Inc. v. Balcke-Durr, Inc., 269 Conn. 599, 610 (2004) (citation omitted). "The general rule of contract law remains that 'a [merger] clause . . . is likely to conclude the issue [of] whether the agreement is completely integrated.'" Tallmadge Bros., 252 Conn. at 504. In Tallmadge, the court found "that the parties' insertion of the merger clauses into the settlement agreement is conclusive evidence of their intent to create fully integrated contracts, and . . . the trial court's subsequent consideration of extrinsic evidence was improper." Id. at 504-05. The merger clause in Section 19.1 of the Agreement establishes that the Agreement is fully integrated. Therefore, even if the answer to the question posed to the J.P. Morgan representative supported Ganter's contention that NRG's understanding was that CL&P was responsible for congestion charges, such evidence would be inadmissible to contradict the unambiguous terms of the Agreement.

Finally, NRG argues that CL&P is estopped from arguing that the Agreement provides that NRG should pay congestion costs. NRG asserts that (1) in a proceeding before the DPUC, CL&P took a position inconsistent with its arguments in support of the instant motion; (2) in proceedings before the FERC, CL&P asserted that the Agreement is at least ambiguous with respect to who has the obligation to pay congestion costs; and (3) that CL&P

18

acknowledged in letter agreements with other suppliers under the same contract that CL&P was responsible for payment of congestion costs.  The court has considered each of these arguments and finds them unpersuasive for the reasons set forth by CL&P in its opposition.

Based on the foregoing, the court concludes that CL&P is entitled to summary judgment on Count I and Count II of the complaint.  Because the court has determined that NRG was responsible under the Agreement for paying congestion charges, and CL&P had the right to withhold disputed payments pursuant to Section 5.4 of the Agreement, the court also concludes that CL&P is entitled to summary judgment on all four counts of NRG's counterclaim.

**IV.  Conclusion**

For the reasons set forth above, the Plaintiff the Connecticut Light & Power Company's Motion for Summary Judgment (Doc. No. 31) is hereby GRANTED.  Judgment shall enter in favor of CL&P on Counts I and II of the complaint and Counts I, II, III, and IV of NRG's counterclaim.  The judgment shall declare that NRG Power Marketing Inc. is obligated to pay for congestion charges imposed under the NEPOOL Transmission Tariff during the Term of the Standard Offer Service Wholesale Sales Agreement between the Connecticut Light and Power Company and NRG Power Marketing Inc. dated as of October 29, 1999.

19

The Clerk shall close this case.

It is so ordered.

Dated this 20th day of July 2007 at Hartford, Connecticut.

```
_____/s/AWT_____
     Alvin W. Thompson
United States District Judge
```